## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ANTHONY SANCHEZ,

      Plaintiff,

      -vs-                                    No. CIV 05-0393 LH/WDS

ALBUQUERQUE PUBLIC SCHOOL SYSTEM,
BOB BITTNER, In His Individual Capacity, and
FRANK MAES, In His Individual Capacity,

      Defendants.

## <u>MEMORANDUM OPINION</u>

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment on Plaintiff's Claim for Constructive Discharge (Docket No. 38), Defendants' Motion for Summary Judgment on Plaintiff's Claims for Due Process, Equal Protection, [sic] Violations and First Amendment Retaliation ("Defs.' Mot. Summ. J. #2") (Docket No. 39), and Defendants' Motion for Summary Judgment of [sic] Plaintiff's Claims for Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, and *Prima Facie* Tort (Docket No. 42), all filed January 17, 2006.  Having reviewed the Motions, the memoranda of the parties, the applicable law, and the record in this case, and otherwise being fully advised, the Court finds that Defs.' Mot. Summ. J. #2 is well taken and shall be **granted**.  Having granted summary judgment to Defendants on Plaintiff's federal law claims, which form the basis of the Court's jurisdiction over this matter, the remaining state law claims will be remanded to state court.

Plaintiff Anthony Sanchez brought suit against Defendant Albuquerque Public School System ("APS") in the Second Judicial District Court of the State of New Mexico, asserting causes of action pursuant to 42 U.S.C. § 1983, in addition to various state law claims.  APS removed the case to federal court, where Plaintiff filed his First Amended Complaint for Damages, adding Bob Bittner and Frank Maes, in their individual capacities, as named Defendants and asserting the following claims:  Count I - Breach of Contract, Count II - Breach of Implied Covenant of Good Faith and Fair Dealing, and Count III - Constructive Discharge, all against Defendant APS; and Count IV - Violation of Plaintiff's Rights Under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution Pursuant to 42 U.S.C. Section 1983, Count V - Violation of Plaintiff's Substantive and Procedural Due Process Rights Under the Fourteenth Amendment of the United States Constitution Pursuant to 42 U.S.C. Section 1983, Count VI - Prima Facie Tort, and Count VII - Violation of Plaintiff's First Amendment Right to Freedom of Speech, apparently against all Defendants.  Plaintiff subsequently stipulated to dismissal with prejudice, pursuant to FED. R. CIV. P. 41(a)(1)(ii), of all of his claims against Bob Bittner and of his due process and prima facie tort claims against Defendants APS and Frank Maes.

This action stems from Plaintiff's prior employment with APS in the Department of Maintenance and Operations.[1]  The issues that led to his filing suit arose from the merger of the preventative maintenance shop into the heating, ventilation, and air conditioning ("HVAC") shop. Mr. Sanchez, who had been an assistant supervisor in the HVAC shop, retained his position as an

---

[1]  The Court views the evidence and draws all reasonable inferences therefrom in the light most favorable to Mr. Sanchez, the non-moving party.  *See, e.g. Schulz v. City of Longmont, Co.*, 465 F.3d 433, 437 (10th Cir. 2006) (citing *Roberts v. Printup*, 422 F.3d 1211, 1214 (10th Cir. 2005)).

assistant supervisor in the combined HVAC shop.  He felt, however, along with a number of other employees, that substantial safety issues would result from the merger because inexperienced and unlicenced technicians would work on and operate school boilers.  Plaintiff expressed  his concern to his supervisors and HVAC management both before and after the merger, but to no avail.  Finally, he went up the chain of command, writing a letter dated June 19, 2003, to the APS Human Resources Department,[2] Pl.'s Consolidated Resp. Defs.' Three Mots. Summ. J. as to All Counts ("Pl.'s Resp."), Ex. F.  A number of technicians addressed their similar concerns within the shop and sent a memo about the situation to the Risk Management Department on June 24, 2003, *id.* at Ex. G.[3]  Mr. Sanchez contends that because of his outspokenness regarding safety issues, he was harassed by his supervisors to the point of having a nervous breakdown and being pushed out of his employment.

Plaintiff's situation at work was difficult in other respects.  Defendant Maes, the manager of the combined HVAC shop, did not include Mr. Sanchez in the decision-making process and spent a lot of time with the only other assistant supervisor, Mr. Shaw.  Also, when Plaintiff witnessed Mr. Maes giving interview answers to Patrick Kehoe, a job applicant Mr. Maes favored, he threatened Plaintiff with his job.  Additionally, from Mr. Sanchez's very first day as an HVAC assistant supervisor, Mr. Maes limited his ability to do the job by taking over all discipline of Plaintiff's subordinates and personally handling any complaints about them.  Thus, Mr. Sanchez had to call Mr. Maes every time a subordinate refused a work order.

---

[2]  Mr. Sanchez apparently also wrote to Risk Management at this time, but neither Plaintiff nor Defendants have provided the Court with a copy of that letter.

[3]  Although Plaintiff refers to "multiple petitions" submitted by HVAC technicians and cites to an Exhibit I, Pl.'s Resp. at 8-9, ¶ 10, there is no Exhibit I attached to his Response.

Mr. Maes further harassed Mr. Sanchez and even demeaned his manhood.  In an attempt to force Paul Silva out of the supervisor position of the combined HVAC shop, Defendant Maes asked Plaintiff to report what Mr. Silva said about him.  Mr. Maes constantly pestered Mr. Sanchez for this information and began referring to Mr. Silva as Plaintiff's "daddy," saying, "He's your daddy.  You better go see what your daddy is doing over there."

On another occasion, even though he was home in bed on sick leave after having suffered an anxiety attack, Mr. Sanchez returned to work when called by a subordinate about a fire in a school kitchen.  When Plaintiff arrived at the school, Mr. Maes confronted him, stating with an attitude, "I thought you were home sick."  Having determined that the source of the fire was a screw that came loose in a gas line, Plaintiff said that he needed a mirror in order to find the missing screw.  Mr. Maes responded, "Why don't you get out your compact so you can find it."  The implication that he had a woman's makeup mirror upset and embarrassed Plaintiff and he made a complaint to his supervisor the next morning.

On June 23, 2003, Plaintiff's supervisors, including Mr. Maes, questioned him about his letter to Human Resources regarding safety issues.  They demanded that he give them a copy, which he refused to do.  Plaintiff then applied for thirty days of annual leave, submitting the leave slip three days in advance, as required.  He wanted the time off to contemplate his work situation and another supervisor had told him it would be approved.  Even though Mr. Shaw previously had been granted three-months leave and Plaintiff had been working as the acting supervisor of the HVAC shop for the past three months, supervising forty-five employees by himself, his leave request was denied.  Plaintiff had a panic attack over the denial of his annual leave.  He got a note from his doctor that day and was out for eight weeks on sick leave.

Shortly after Plaintiff returned to work, Mr. Maes completed an evaluation of Mr. Sanchez, dated August 20, 2003.  *See* Defs.' Mot. Summ. J. #2, Ex. C (Maes Aff.), Ex. 3.  The evaluation included forty-four individual criteria which could be rated "unsatisfactory," "requires improvement," "meets standards," or "not applicable."   Mr. Maes rated Plaintiff as "meets standards" for forty-one of the criteria and as "requires improvement" in three.[4]  In the "Summary of Appraisal" section, where he was to "summarize the effectiveness of administrator as the effectiveness relates to the established job targets and performance," Mr. Maes wrote, "Anthony's technical knowledge in the field has been great.  His ability to access equipment problems and get quick repairs has been great.  As a field supervisor his performance has been outstanding."  *Id.*

Mr. Sanchez applied for other jobs with APS during this period of time, but was never selected.[5]  In November 2003, he applied for a technician position in the Cafeteria Equipment Repair Department.  Mr. Maes wrote a letter of recommendation for Plaintiff[6] and he was interviewed for

---

[4]  Two of the three "requires improvement" criteria fell under the section titled, "The administrator works cooperatively within the environment promolgated [sic] by the administration to further the goals of the district," and were "by contributing to the general well being of the work environment" and "by maintaining positive professional relationships with APS employees."  Defs.' Mot. Summ. J. # 2, Ex. C (Maes Aff.), Ex. 3 at *1.  The third was  "The administrator communicates accurately and effectively: . . . by contributing ideas for the improvement of the unit."  *Id.*

[5]  One of the two jobs Plaintiff mentions was for a vacuum repair technician vacancy in the Custodial Department.  Mr. Sanchez was interviewed for the position, but a custodian department employee was selected.  Although Plaintiff felt he was "blackballed out of that job," Pl.'s Resp., Ex. A (Dep. Anthony Sanchez) 42:21, he further explained that this was because the head of the Department "just didn't like me because I told him that I was going to file a grievance against him," *id.* 44:24-25.

[6]  Mr. Maes's letter, dated November 14, 2003, stated in relevant part:

I highly recommend Anthony Sanchez for the position of Cafeteria repair technician.  Anthony has shown that he is knowledgeable in the field of refrigeration and kitchen appliance repair.  Anthony is dedicated to his equipment and ensuring that the longevity and operation is maintained.  I know that Anthony would be a valuable asset to your department and to the APS district.  Anthony has shown his dedication to the children by devoting his time to that equipment that serves the needs of the children.  I am confident that Anthony will meet your needs, the needs of the district, and the needs of the children of APS.  I am also confident that any challenge that you give to Anthony, he will meet and or exceed those challenges with great success.

5

the job.  He was notified by letter dated February 24, 2004, however, that the position was not filled.

Plaintiff felt that he was not selected because of his reputation for high standards for himself and his

subordinates regarding compliance with safety rules and because of his complaints about safety.

In December of 2003, Mr. Maes advertised the position of HVAC Supervisor and

interviewed applicants.  Although six-month waivers of licensing requirements previously had been

granted, including to Mr. Maes when he assumed the position of manager of the merged HVAC

shop, Mr. Maes refused to extend  any waivers for this opening.  Mr. Sanchez did not have one of

the three required licenses and, therefore, did not apply.  Mr. Maes essentially was able to preselect

Mr. Kehoe and Mr. Shaw, the only two employees who had all the required licenses, and to select

Mr. Shaw for the position.  Although Mr. Sanchez had some reservations about the job, he would

have applied for it if he had been given a six-month waiver to get a sheet metal license.

Although Plaintiff accepted another job with a private employer, he felt he was forced out

of APS, and he would have resigned because of the emotional stress he was experiencing at work,

even if he had not secured the new position.  Plaintiff submitted his resignation in February of 2004

and took several weeks of annual leave before his last day with APS on March 24, 2004.

As a preliminary matter, Plaintiff contends that by filing three Motions for Summary

Judgment, Defendants have circumvented the Local Rules of this District and that the Motions,

therefore, should be stricken.  While it is true that the Rules set forth a maximum combined length

of twenty-seven pages for any motion and supporting brief, *see* D.N.M.LR-Civ. 7.7, and a limit of

not more than fifty pages of exhibits to a motion, *see id.* 10.5, they in now way limit the number of

---

Defs.' Mot. Summ. J. # 2, Ex. C (Maes Aff.), Ex. 2.

motions a party may file.  Indeed, the Court finds Plaintiff's position that parties should be limited to one motion and supporting brief of no more than twenty-seven pages, regardless of the complexity of a case, to be nonsensical.  While this is not to say, of course, that such abuse can never occur,[7] where, as here, Plaintiff has brought multiple claims against three Defendants, the Court does not find the filing of three Motions for Summary Judgment by Defendants, each of which meets the page and exhibit limits prescribed by the Local Rules, in any way offends the letter or spirit of the Local Rules.

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Roberts v. Printup*, 422 F.3d 1211, 1214 (10th Cir. 2005)(quoting FED. R. CIV. P. 56(c)). The issue is not whether the Court "thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 252 (1986).  In other words, "there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.*

---

[7] *See, e.g., Smith v. City of Albuquerque*, Civ. No. 01-0416, slip. op. at 1 n.1 (D.N.M. Oct. 8, 2002)("The Court takes this opportunity to disapprove of the motions practice of both Defendants in this case.  Each Defendant has split what should be one motion for summary judgment into multiple motions for partial summary judgment.  While this practice was probably employed to allow the attorney to forego the difficult task of succinct analysis, this procedure is burdensome on the opposing party and on this Court.")

In their Mot. Summ. J. #2, Defendants first maintain that they should be granted summary judgment on Plaintiff's equal protection claim.[8]  In response, Plaintiff clarifies that he brings this claim under the "class-of-one" theory.[9]  The Supreme Court formally recognized this type of equal protection action in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).  *Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1209 (10th Cir. 2006).  *Olech* exemplifies the paradigmatic class-of-one case, that of a public official inflicting "a cost or burden on one person without imposing it on those who are similarly situated in material respects, and do[ing] so without any conceivable basis other than a wholly illegitimate motive."[10]  *Id.* (citing *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005)).  As the circumstances diverge from this framework, however, "'the sense of a wrong of constitutional dignity, and of a need for a federal remedy, attenuates.'"[11]  *Id.*

---

[8]  As discussed above, Plaintiff voluntarily dismissed his due process claim in response to Defs.' Mot. Summ. J. #2.  Thus, the only federal claims remaining are those based on equal protection and first amendment retaliation.

[9]  In their Reply brief, Defendants essentially ignore Plaintiff's class-of-one theory argument, continuing to discuss the standard for a traditional equal protection claim and arguing in a footnote only that Plaintiff "is not permitted to introduce new legal theories for the first time in a hope to defeat summary judgment," and that any theory under which Plaintiff may bring this claim must fail because he has not "refute[d] that Defendants' actions were rationally related to a legitimate government interest."  Defs.' Reply Mot. Summ. J. #2 at 3 n.2.

The Court does not agree that Plaintiff did not sufficiently state a class-of-one claim in his Amended Complaint.  *See* Pl.'s First Am. Compl. ¶¶ 31-33 ("action taken by Defendants . . . towards Plaintiff was motivated by a spiteful effort to harass Plaintiff and remove Plaintiff from his employment for reasons wholly unrelated to any legitimate state objective . . . Defendants treated Plaintiff differently . . . than they did other similarly situated employees . . . action taken by Defendants toward Plaintiff . . . was irrational and wholly arbitrary"); *infra*. note 10.

[10]  In *Olech*, the municipality required a 33-foot easement from the plaintiff as a condition for water service, but only a 15-foot easement from every other property owner.  *Jicarilla*, 440 F.3d at 1209 (citing *Olech*, 528 U.S. at 563).  The *Olech* Court held that the plaintiff's allegation that the municipality's demand was "irrational and wholly arbitrary," sufficiently stated an equal protection claim, thus, withstanding a motion to dismiss.  *Id.* (citing *Olech*, 528 U.S. at 565).

[11]  In applying the class-of-one theory, the Tenth Circuit, like most others,

ha[s] proceeded cautiously . . . , sensitive to Justice Breyer's warning [in his concurrence in *Olech*] against turning even quotidian exercises of government discretion into constitutional causes.  An approach that reads *Olech* too broadly could transform the federal courts into "general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system."

(quoting *Lauth*, 424 F.3d at 633).  Indeed, the Seventh Circuit has commented that "the case for federal judicial intervention in the name of equal protection is especially thin" when "the unequal treatment arises out of the employment relation."[12]  *Lauth*, 424 F.3d at 633.

Under the class-of-one equal protection doctrine, a plaintiff need not allege that he was part of a suspect class or that a fundamental right is implicated.  *Bartell v. Aurora Pub. Sch.*, 263 F.3d 1143, 1149 (10th Cir. 2001)(citing *Olech*, 528 U.S. at 565).  Rather, the Court considers "(1) whether the defendants advanced grounds that are not 'irrational and wholly arbitrary' . . . , and (2) whether [there were others] similarly situated in every material respect."[13]  *Jicarilla*, 440 F.3d at 1210 (citing *Jennings v. City of Stillwater*, 383 F.3d 1199, 1212-13 (10th Cir. 2004)).  The latter requirement "'is especially important in class-of-one cases.'"[14]  *Id.* at 1212 (quoting *Jennings*, 383 F.3d at 1213).

---

*Jicarilla*, 440 F.3d at 1209 (internal citation omitted)(quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1211 (10th Cir. 2004)).

[12] The *Lauth* court "was not surprised to have found no 'class of one' cases in which a public employee has prevailed, since the extreme case that kicked off the 'class of one' movement more than two decades ago."  424 F.3d at 633-34 (internal citations omitted).  It declined, however, "to rule that a public employee can *never* maintain a class-of-one case."  *Id.* at 634.

[13] In his concurrence in *Olech*, Justice Breyer suggested requiring an "extra factor," that a defendant bear subjective ill will toward a plaintiff, as a means of limiting overuse of class-of-one cases.  *Jicarilla*, 440 F.3d at 1209-10 (citing *Olech*, 528 U.S. at 566).  The *Olech* majority, however, did not adopt this approach, and it has been left "to the circuit courts to give content to the phrase 'irrational and wholly arbitrary.'"  *Id.* at 1210.  In so doing, the Tenth and other circuits have "struggled with the question of whether class-of-one claims require an allegation of subjective ill will" on the part of a defendant.  *Id.* (citing various circuit opinions divided on the question).  Although this issue has not been resolved, it is clear that "if subjective ill will is a *necessary* condition for a class-of-one claim, it is not a sufficient one."  *Id.* (citing *Barstad v. Murray County*, 420 F.3d 880, 887 (8th Cir. 2005); *Olech v. Village of Willowbrook*, 160 F.3d 386, 388 (7th Cir. 1998)("[A] tincture of ill will does not invalidate governmental action."), *aff'd Olech*, 528 U.S. 562 (2000)).  Thus, if there was an objectively reasonable basis for a defendant's actions, summary judgment is appropriate, even without allowing discovery on the question of subjective ill will.  *Id.*  Additionally, "[b]ecause a class-of-one plaintiff must show that the official action was *objectively* irrational and abusive, . . . pretext is not an issue.  We ask not whether the Defendants' proffered justifications were sincere, but whether they were objectively reasonable."  *Id.* at 1211.

[14] As the Tenth Circuit has explained, the requirement that a plaintiff demonstrate similarity in all material respects at the summary judgment stage,

comports with the intuition that the degree of similarity an equal protection plaintiff needs to show

With these criteria in mind, Plaintiff's class-of-one equal protection claims clearly must fail. Plaintiff argues that he was similarly situated to and treated differently than Mr. Shaw in that "Defendant Maes spent large amounts of time with Mr. Shaw[, he was] cut out of the decision making process, and was harassed, demeaned and embarrassed by Defendant Maes[, he] was not allowed to get a waiver to apply for the Supervisor position, . . . [he] was denied annual leave, [and he] was given lower performance evaluations by Defendants." Pl.'s Resp. at 12-13.

Plaintiff's assertion that he was similarly situated to Frank Shaw because he and Mr. Shaw were the only two assistant managers within HVAC department and they had the same job duties and responsibilities is insufficient to show that they were "similarly situated in every material respect." *Jicarilla*, 440 F.3d at 1210 (citing *Jennings*, 383 F.3d at 1212-13). Thus, Plaintiff cannot overcome summary judgment as to this element of his case-of-one equal protection claim.[15] Most tellingly, it

---

will vary inversely with the size of the relevant class. If a plaintiff belongs to a large class, a systematic difference in treatment probably is not caused by individualized differences or statistical aberrations. But when the class consists of one person or entity, it is exceedingly difficult to demonstrate that any difference in treatment is not attributable to a quirk in the plaintiff or even to the fallibility of administrators whose inconsistency is as random as it is inevitable. Accordingly, courts have imposed exacting burdens on plaintiffs to demonstrate similarity in class-of-one cases. *See, e.g., Jennings*, 383 F.3d at 1214 (holding that it is "imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class"); *Neilson* [*v. D'Angelis*], 409 F.3d [100,] 105 [(2d Cir. 2005)] (requiring a class-of-one plaintiff to show that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy"); *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir.2004) (requiring that the other parties be "very similar indeed"); *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir.2002) (insisting that a plaintiff demonstrate that the compared properties are "prima facie identical in all relevant respects").

*Jicarilla*, 440 F.3d at 1212-13.

[15] As the Tenth Circuit explained in *Jennings*, Plaintiff "bears the burden of proof on this issue after discovery." 383 F.3d at 1215 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)(""[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")).

is undisputed that Mr. Shaw held all three licenses required for the Supervisor position and that Plaintiff did not.  Thus, Mr. Shaw did not require a waiver to apply for the position.[16]  Also, Mr. Sanchez and Mr. Shaw did not apply for annual leave contemporaneously; Mr. Shaw apparently was granted and started his leave months before Plaintiff submitted his application.  Furthermore, with regard to his allegedly lower performance evaluation, Plaintiff has offered the Court no evidence regarding performance evaluations of Mr. Shaw or any other employee within the HVAC shop, or even his own prior evaluations.  Therefore, no determination can be made even as to whether Plaintiff's August evaluation was lower than his previous evaluations, much less whether he was treated differently than anyone else.

Plaintiff's class-of -one claim is similarly deficient as to the first element-- that he "must show that the official action was *objectively* irrational and abusive." *Jicarilla*, 440 F.3d at 1211.  For example, no reasonable jury could find Mr. Maes's refusal to grant Plaintiff a waiver of the license requirements to apply for the Supervisor position or to allow Plaintiff to take a month of annual leave, irrational or wholly arbitrary.[17]  As Plaintiff, himself, has admitted, requiring all three licenses for the Supervisor position was reasonable.  *See* Defs.' Mot. Summ. J. #2 Ex. A (Pl.'s Dep.) 142:1-3.

---

[16] Indeed, in this regard Plaintiff was treated no differently than any other potential applicant - it is undisputed that no waivers were granted to anyone.

[17] As the *Lauth* court reminds:

a plaintiff who does not belong to any "suspect" (that is, favored) class--by definition, the situation of a class-of-one plaintiff--must, to prevail, "negative any reasonably conceivable state of facts that could provide a rational basis for the classification." *Board of Trustees v. Garrett*, 531 U.S. 356, 367, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *Lamers Dairy, Inc. v. U.S. Dept. of Agriculture*, 379 F.3d 466, 473 (7th Cir. 2004).  "Governmental action only fails rational basis scrutiny if no sound reason for the action can be hypothesized." *Id.*; *see also FCC v. Beach Communications*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).

424 F.3d at 634.

11

Additionally, Defendants' decision to advertise the Supervisor position initially without waiving any requirements, including licensing, and to resort to waivers only if no qualified applicants applied, was in no way irrational or arbitrary. *See id.* Ex. C (Maes Aff.) at 2. Furthermore, a policy allowing supervisors to limit approval of vacation requests to maintain adequate staffing levels and to meet operational needs, unarguably rests on a sound, rational basis, *see id.* Ex. B (Albuquerque Public Schools Employee Handbook) at 31, and as even Plaintiff has recognized, it was dangerous to have a shortage of supervision of technicians in the HVAC shop, *see id.* Ex. A 297:7-298:1. Thus, Defendants did not act irrationally or arbitrarily in denying Mr. Sanchez annual leave while the shop was short-staffed on June 23, 2003, *see id.* Ex. C (Maes Aff.) at 2. Neither could a reasonable jury find the fact that Mr. Maes spent a lot of time with Mr. Shaw and personally handled employee discipline within the shop wholly irrational and arbitrary.

Finally, with regard to the general concept of class-of-one equal protection claims, "[a]ll have recognized that, unless carefully circumscribed, [it] could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors." *Jennings*, 383 F.3d at 1211, *quoted in Lauth*, 424 F.3d at 634. "To decide is to choose, and ordinarily to choose *between*--to choose one suppliant, applicant, petitioner, protester, contractor, or employee over another." *Indiana State Teachers Ass'n v. Bd. of Sch. Comm'rs*, 101 F.3d 1179, 1181 (7th Cir. 1996). Not only is "[t]he concept of equal protection . . . trivialized when it is used to subject every decision made by state or local government to constitutional review by federal courts[, but t]here is nothing irrational or vicious about preferring the known quantity to the unknown[; t]rust and commitment are not unknown or misplaced in labor relations any more than in other relational or transactional settings." *Id.* at 1181-82. In fact, it is unclear whether the

precedent of *Olech* can be stretched to cover such a case--"not a case of discrimination against a

'class of one,' but a case of discrimination in favor of [another]." *Jennings*, 383 F.3d at 1212.

Neither does it seem reasonable that the Equal Protection Clause should become "a general civility

code" for the public workplace. *Cf. Burlington N. & Santa Fe Ry. Co. v. White*, ___ U.S. ___, 126

S. Ct. 2405, 2415 (2006)(Title VII of the Civil Rights Act of 1964 "does not set forth 'a general

civility code for the American workplace.'")(quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523

U.S. 75, 80 (1998), and citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)("judicial

standards for sexual harassment must 'filter out complaints attacking the ordinary tribulations of the

workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional

teasing'")).[18]


Defendants also move for summary judgment on Plaintiff's First Amendment retaliation

claim.  It has long been settled that an employee does not waive all of his or her First Amendment

rights by accepting public employment. *See, e.g., Deschenie v. Bd. of Educ.*, 473 F.3d 1271, 1276

---

[18] As the *White* Court further explained, Title VII's "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm," and in determining "the level of seriousness to which this harm must rise before it becomes actionable retaliation, . . . it is important to separate significant from trivial harms":

> An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. *See* 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable under § 704(a)).  The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. *Robinson* [*v. Shell Oil Co.*], 519 U.S. [337,] 346 [(1997)].  It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid.*  And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. *See* 2 EEOC 1998 Manual § 8, p. 8-13.

126 S. Ct. at 2414-15 (setting a standard of "*material* adversity" for a retaliatory action challenged pursuant to Title VII).

(10th Cir. 2007)(citing *Garcetti v. Ceballos*, ___ U.S. ___, ___, 126 S. Ct. 1951, 1957 (2006)).

While "employee-speech jurisprudence protects . . . the constitutional rights of public employees[,]

. . . the interests at stake extend beyond the individual speaker . . . [to] promoting the public's interest

in receiving the well-informed views of government employees engaging in civic discussion."

*Garcetti*, 126 S. Ct. at 1958.  Government employers, like private employers, however, "'need a

significant degree of control over their employees' words and actions; without it, there would be little

chance for the efficient provision of public services.'"  *Green v. Bd. of County Comm'rs*, 474 F.3d

794, 797 (2007)(quoting *Garcetti*, 126 S. Ct. at 1958)).  Accordingly,

> [w]hen an employee speaks as a citizen addressing a matter of public concern, the
> first Amendment requires a delicate balancing of the competing interests surrounding
> the speech and its consequences.  When, however, the employee is simply performing
> his or her job duties, there is no warrant for a similar degree of scrutiny.[19]

*Garcetti*, 126 S. Ct. at 1961.  Thus, "when public employees make statements pursuant to their

official duties, the employees are not speaking as citizens for First Amendment purposes, and the

Constitution does not insulate their communications from employer discipline."[20]  *Id.* at 1960.

The initial inquiry for courts in government-employment First Amendment cases, then, is

"whether a public employee 'spoke as a *citizen* on a matter of *public* concern.'"  *Green*, 472 F.3d at

798 (quoting *Garcetti*, 126 S. Ct. at 1958; and citing *Connick v. Myers*, 461 U.S. 138, 147 (1983);

*Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  The starting point for this analysis is "what

---

[19]  As the *Garcetti* Court further commented, "[t]o hold otherwise would be to demand a permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers."  126 S. Ct. at 1961.

[20]  While "[t]he Court's decisions . . . have sought both to promote the individual and societal interest that are served when employees speak as citizens on matter of public concern and to respect the needs of government employers attempting to perform their important public functions[, u]nderlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'"  *Id.* at 1959 (internal citation omitted)(quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)).

speech and conduct is at issue." *Id.* at 799.  Mr. Sanchez identifies his protected speech as beginning

in 2000 with his safety complaints to his supervisors and HVAC management regarding the merger

of the preventative maintenance shop into

 the HVAC shop, which concerns he continued to voice over the years and took up the chain of

command, culminating with his letter to APS Human Resources on June 19, 2003.

Next, the Court examines Plaintiff's "job description, keeping in mind that inclusion of a job

duty in a formal job description 'is neither necessary nor sufficient to demonstrate that [conduct] is

within the scope of the employee's professional duties for First Amendment purposes.'" *Id.* at 800

(quoting *Garcetti*, 126 S. Ct. at 1962).  Although the parties have not provided the Court with a job

description, it is undisputed that Mr. Sanchez held the position of assistant supervisor in the HVAC

shop.  Clearly, the safe maintenance of school boilers and other equipment, and his communications

with his superiors concerning the same, fell within his job responsibilities.  Thus, the Court can only

conclude that Mr. Sanchez speech in this regard indisputably was that of a government employee,

not that of a citizen.  As such, his speech, even though it may have involved matters of great public

concern, is not protected under the First Amendment.  *Cf. Green*, 472 F.3d at 800-01 (plaintiff "was

not communicating with newspapers or her legislators or performing some similar activity afforded

citizens; . . . activities stemmed from and were the type of activities that she was paid to do . . . did

not speak or act in capacity as a citizen, but as a government employee").[21]  The Court certainly

---

[21] While the Supreme Court in *Garcetti* "had no occasion to articulate a comprehensive framework for defining
the scope of an employee's duties in cases where there is room for serious debate," the *Green* court found the following
cases noteworthy in helping it address the issue:  *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006)(plaintiff acted as citizen
in communications with senator and IG, but internal complaints not protected because submitted pursuant to her duties
as correctional officer); *Battle v. Bd of Regents*, 468 F.3d 755 (11th Cir. 2006)(university employee who reported
improprieties in supervisor's handling and management of federal financial aid funds acted pursuant to her official
employment responsibilities; retaliation claim failed); *Mills v. City of Evansville*, 452 F.3d 646 (7th Cir. 2006)(police
sergeant's criticism of department reorganization proposal while on duty and in uniform made in capacity as public

acknowledges that Mr. Sanchez, like the employees in *Garcetti*, *Battle*, *Freitag*, *Mills*, and *Green*, was "was trying to focus attention on apparently misguided actions or improper situations." *Green*, 472 F.3d at 802. Nonetheless, his conduct is no more protectable under the First Amendment than theirs.[22] *See id.*

To the extent, if any, that Plaintiff's constitutional claims are brought against Defendant APS, they too must be dismissed. *See, e.g., Maestas v. Segura*, 416 F.3d 1182, 1184 n.1 (C.A.10 2005) (citing *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1154-56 (10th Cir.2001)(§1983 requires a predicate constitutional violation to support municipal liability); *Jennings*, 383 F.3d at1205 n.1.

Finally, having dismissed all claims over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and will remand this those claims to state court. *See, e.g., Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1263 n.3 (10th Cir. 2006)(citing 28 U.S.C. § 1367(c)(3)).

An Order in accordance with this Memorandum Opinion shall be entered contemporaneously.

_____

**SENIOR UNITED STATES DISTRICT JUDGE**

---

employee contributing to formation and execution of official policy, not as citizen). *Green*, 472 F.3d at 798-99 (internal quotations omitted).

[22] As *Garcetti* admonishes, "government employee's [sic] First Amendment rights do 'not invest them with a right to perform their jobs however they see fit.'" *Green*, 472 F.3d at 801 (quoting *Garcetti*, 126 S. Ct. at 1960). Furthermore, "[t]he *Garcetti* Court sought to avoid 'judicial oversight of communications between and among government employees and their superiors in the course of official business' and 'displacement of managerial discretion by judicial supervision.'" *Id.* (quoting *Garcetti*, 126 S. Ct. at 1961).